671 So.2d 1015 (1996)
MARINER'S VILLAGE MANDEVILLE, INC.
v.
FAMA, INC., Louisiana Insurance Guaranty Association, W.O. Pruitt and Ese Flowers.
No. 95-CA-1867.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1996.
Writ Denied May 17, 1996.
*1016 Robert S. Kennedy, Jr., Geoffrey H. Longenecker, Law Offices of Geoffrey H. Longenecker, a Professional Law Corporation, Covington, for Plaintiff/Appellee.
Glen Scott Love, Dawn T. Trabeau-Mire, Matthews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for Defendant/Appellant, Louisiana Insurance Guaranty Association.
Before SCHOTT, C.J., and PLOTKIN and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Mariner's Village Mandeville, Inc. (Mariner's), a Louisiana corporation, sued Louisiana Insurance Guaranty Association (LIGA), as successor to the obligations of Eastern Indemnity Company of Maryland (Eastern), for $300,000 under Performance Bonds issued on or about 29 May 1984, guaranteeing payment of two checks, each in the amount of $300,000, issued by defendant FAMA, Inc. on or about the same date. The checks were presented for payment at the drawee bank and were dishonored for lack of sufficient funds on account. On 10 July 1984, Mariner's made demand on FAMA pursuant to LSA-R.S. 14:71 for payment of the two checks. FAMA failed to pay the checks. Eastern failed and/or refused to perform under its bond, and became insolvent; its obligations were assumed by LIGA to the extent *1017 provided by law, and limited to $150,000 per claim, subject to a $100 per claim deductible.[1]
LIGA filed exceptions of Insufficiency of Citation and/or Service of Process, Improper Venue, Lack of Personal Jurisdiction, Vagueness or Ambiguity, Prescription, No Cause of Action and/or No Right of Action. All exceptions were denied by Judgment of 12 April 1993. LIGA did not seek appellate review of that Judgment, and answered and filed a third party demand against the other original defendants and others.[2] Mariner's moved to strike or, alternatively to sever LIGA's third party demand, which motion was denied on 14 September 1993. LIGA then moved for Summary Judgment dismissing Mariner's petition, in support of which LIGA filed the affidavit of Eastern's Receiver, James A. Gordon. The matter was set for bench trial on 1 February 1995, and was submitted by joint stipulation of the parties and the Court on 21 February 1995.
On 13 April 1995, the trial court rendered judgment in favor of Mariner's and against LIGA for $300,000 with interest from 27 June 1984 until paid, together with court costs. On 16 May 1995, the trial court denied LIGA's Motion for New Trial and/or Reargument. LIGA appeals from the Judgment. We amend the judgment and affirm the judgment as amended.

STATEMENT OF FACTS
Mariner's is a Louisiana corporation formed and wholly owned by Geoffrey Longenecker. On 12 September 1983, it purchased from Prestressed Concrete Products Company, Inc. (Prestressed) a tract of land in Mandeville, LA for $4,019,537.60. Mariner's paid $250,000 in cash, which it obtained from Howard Johnsa and for which Mariner's gave Johnsa a note endorsed by Longenecker. Prestressed's sole recourse under its note and mortgage for the balance of the sale price was against Mariner's and the mortgaged property. Longenecker testified that Johnsa was to obtain the necessary financing to develop the property, and Johnsa's construction company would do the construction work at the site. When Johnsa did not perform, Prestressed foreclosed on its mortgage and Mariner's sought protection from creditors and reorganization under Chapter 11 of the bankruptcy laws.
Among the options considered in the reorganization was a sale of the property. In March or April of 1984, Lee Cox and associates, M.L. Pittman, and a number of others, including Johnsa, expressed an interest in acquiring the property. Following negotiations and subject to approval by the Bankruptcy court, Mariner's entered into a Real Estate Purchase Agreement with Cox, Crawford, Neiman Associates, Inc. (CCNA) on 29 May 1984, whereby Mariner's agreed to sell the parcel to CCNA for $6,000,000 in cash payable at the closing. The escrowed cash deposit of $600,000, representing 10% of the purchase price, was financed by Frank Montgomery and his corporation, FAMA, Inc. The escrow checks referred to in Article I, Section 1.1 of the Real Estate Purchase Agreement were numbered 608 and 609 and were drawn on the account of FAMA, Inc. at First City Bank of Fort Worth, Texas. The checks were made payable 28 days from the date of issue, and the closing of the Act of Sale was set for noon, 30 June 1984 or an earlier, mutually agreeable date. Attached to the Real Estate Purchase Agreement and checks were two performance bonds issued by Eastern in favor of FAMA, binding Eastern to Mariner's for $300,000 for check # 608 and for $300,000 for check # 609. The Bankruptcy Court approved the form of the sale and escrow, having insisted that the $600,000 deposit be bonded.
Longenecker testified that Mariner's stood ready to deliver title to the property during the period allowed for closing. CCNA acknowledged this fact in the Cancellation Agreement of 9 July 1984. For reasons unknown *1018 to Longenecker, CCNA failed to close by 30 June 1984, triggering a default and forfeiture of the escrow deposit. The Bankruptcy petition was dismissed, the stay of foreclosure on the property was lifted, and Prestressed foreclosed on its mortgage. According to Longenecker's testimony, CCNA acknowledged its default and authorized Mariner's to proceed against the surety on the bonds. CCNA and Mariner's executed a cancellation agreement on 9 July 1984 cancelling and terminating the Real Estate Purchase Agreement and related agreements of 29 May 1984 as amended on 29 June 1984. In the cancellation agreement, CCNA acknowledged its default and demand of forfeiture of the cash deposit, and the parties acknowledged presentment of the checks and their dishonor, and noted that claims had been made against Eastern on its two bonds dated 29 May 1984. CCNA assigned its rights against FAMA and Eastern to Mariner's to the extent of the $600,000 total bonded deposit, and Mariner's assigned to CCNA its rights against Eastern, FAMA or other parties in excess of $600,000, and released CCNA from claims for attorney's fees, costs, specific performance or any further claims, obligations or causes of action which may exist or which it then had or may have in the future in connection with the transaction, or for damages of any nature or kind; CCNA similarly released Mariner's. Longenecker testified that he made his first claim against Eastern in the Bankruptcy proceeding on or about 29 June 1984. On 28 January 1985, Eastern was ordered liquidated by the Circuit Court for Montgomery County, Maryland in Case No. 3406, and was declared insolvent on 11 February 1985. Eastern's license was suspended in Louisiana on 17 December 1984, and it was placed in conservation in Maryland and Louisiana on 1 March 1985. Suit was filed against LIGA as Eastern's successor in interest in 1988.
James Gordon, the receiver for Eastern, testified by deposition. As deputy receiver and as receiver he was aware that Eastern's books, records and internal documents were originally kept at Eastern's business offices and were relocated to the receivership's office, which was itself once relocated. Some of Eastern's branch offices had been administered by ancillary receivers, who had custody of the records in their respective offices, but, to the best of Gordon's knowledge, the ancillary receivers were to have returned all records to his custody. He testified that, to the best of his knowledge, he has custody of all Eastern's documents. Gordon testified that he examined Eastern's records and could find no record of the performance bonds for either FAMA check # 608 or FAMA check # 609. He testified that he was unable to find any indication that a premium or other payment was made for the purchase of either of the performance bonds. He discovered no records to confirm issuance of the bonds. Gordon testified that although he was not an Eastern employee at the time the bonds were issued, it was his understanding that Eastern issued Powers of Attorney to branch office employees, and, therefore, these bonds could have been issued from branch offices without any home office approval and without payment having been tendered to the home office. Gordon testified that at the time the bonds were issued, Eastern was doing business as an insurance company and was authorized to issue bonds such as these. He testified that based on his review of Eastern's personnel records, Lori Hoffmeyer and Charlene Bourgeois, whose names appear on the bonds and powers of attorney, were an Eastern agent and corporate secretary, respectively, at the time the bonds were issued. He identified Robert Koken, whose signature appears on the certified copy of the power of attorney, as an Eastern employee who was at some time senior vice-president of the company and testified that the signature appeared to be a copy of Koken's signature. He also identified the seal appearing on the documents as Eastern's corporate seal.

SCOPE OF REVIEW
The appropriate standard for appellate review is the "manifest error-clearly wrong" standard, which precludes the setting aside of a trial court's findings of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. Lewis v. State, through Department of Transp. and Development, 94-2370, p. 4 (La. 4/21/95), 654 So.2d 311, 314; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). This standard applies *1019 even where the trier of fact decided the case on the basis of a trial transcript, documentary evidence and deposition transcripts. Alexander v. Pellerin Marble & Granite, 93-1698, p. 5 (La. 1/14/94), 630 So.2d 706, 709-710. The manifest error standard implies a two-tier test:
(1) [t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Lewis, 94-2370 at p. 5, 654 So.2d at 314, citing Mart v. Hill, 505 So.2d 1120 (La.1987).

FINDINGS OF THE TRIAL COURT
The trial court orally assigned its reasons for judgment. It found that LIGA's predecessor was a surety for the valid underlying obligation between FAMA and Mariner's. It found further that LIGA's defense of failure of consideration was without merit, and that the record reflects that the bonds were signed by Lori Hoffmeyer, identified as an Eastern employee, who was authorized by Eastern to sign for them by written power of attorney; that the bonds were written on a form identified as Eastern's own bond form; that the bonds contained Eastern's seal and were accompanied by a power of attorney in Hoffmeyer's favor executed by a senior vice-president of Eastern whose signature was certified by the corporate secretary.
The court rejected LIGA's contention that its liability was limited to a single payment of $50,000, finding that two bonds were issued representing a distinct risk and each conditioned upon the non-payment of an individual check.

FIRST ASSIGNMENT OF ERROR: The trial court erred in holding that if LIGA is a surety, it did not have any valid defenses such as want or failure of consideration.[3]
Generally, a suretyship contract is an accessory promise by which the surety binds himself to fulfill the obligations of the principal, should the principal fail to perform. LSA-C.C. art. 3035. A suretyship contract must be strictly construed in favor of protecting the obligee. Nicholson & Loup, Inc. v. Carl E. Woodward, Inc., 596 So.2d 374, 390 (La.App. 4 Cir.1992), writ denied, 605 So.2d 1098 (La.1992). Obligations set forth in a bond given by a compensated surety are strictly construed in favor of protecting the obligee. Stonecipher v. Mitchell, 26,575, p. 11 (La.App. 2 Cir. 5/10/95), 655 So.2d 1381, 1389. The Expose' des Motifs to Title XVI of the Revised Civil Code notes:
The revised articles reflect the view that one who guarantees the commercial undertakings of another, or of an entity created for commercial purposes should not expect to be treated as a mere volunteer acting for the debtor out of a spirit of liberality, nor should a person or entity entering into a contract for its own commercial ends be so regarded. Finally they assume a business corporation or other artificial entity organized for commercial or business purposes should not expect to be treated with liberality at the expense of the other parties to the contract, merely because it is guaranteeing the debts of another. Pre. C.C. art. 3035.
We find that LIGA failed to sustain its burden of proving the defense of failure of consideration as between Mariner's and FAMA. Only when the maker of a negotiable instrument establishes failure of consideration will the burden shift to the holder to prove that he is a holder in due course before maturity in good faith and for valuable consideration. See Courtesy Financial Services, Inc. v. Hughes, 424 So.2d 1172, 1174 fn. 1 (La.App. 1 Cir.1982); Equitable Discount Corp. v. Jefferson Television Sales and Service, 169 So.2d 567 (La.App. 4 Cir.1964). The only testimony offered concerning the underlying real estate transaction is Longenecker's deposition, which shows that Mariner's stood ready to deliver title to CCNA, for whom FAMA had put up the earnest money deposit, and the cancellation agreement executed by Mariner's and CCNA in which both parties agree that Mariner's offered to perform its obligations under the *1020 purchase agreement. Mariner's executed a promise to sell on terms and conditions, including Eastern's performance bonds, approved by the bankruptcy court. Based on the record viewed in its entirety, we cannot say that the trial court was clearly wrong in finding that LIGA had not sustained its burden of demonstrating failure of consideration.

SECOND ASSIGNMENT OF ERROR: The trial court erred in holding that the bonds issued by Eastern Indemnity Company created a suretyship.
LIGA contends that there was no underlying contract between FAMA and Mariner's that would support the accessory suretyship contract. The trial court correctly found an underlying obligation by FAMA to Mariner's. This finding is supported by the checks, numbered 608 and 609, drawn by FAMA in favor of Mariner's. It was the obligation to pay the checks, an obligation that appeared unconditional on the faces of the checks, for which Eastern stood as surety in the bankruptcy court-approved transaction. The evidence shows that FAMA issued the checks to Mariner's and that Eastern issued its bonds to insure that the checks would be paid, irrespective of any condition arising out of the proposed real estate transaction. This specification of error is without merit.

THIRD ASSIGNMENT OF ERROR: The court erred in holding that LIGA could be liable unto Mariner's Village because the bonds sued upon were not properly issued.
LIGA's argument as to the improper issuance of the bonds relies on its interpretation of the testimony of Eastern's Receiver, James Gordon, that Eastern's books do not reveal issuance or receipt of premium payment for the two bonds. This ignores the facts that the bonds are regular on their faces and that Gordon did not have custody of all Eastern's records from the time the bonds were issued to the time his deposition was taken. His testimony that his search did not reveal documentation for the bonds among Eastern's records does not prove that the bonds were not issued. Gordon testified that the records of some of Eastern's branch offices were in the custody of ancillary receivers for part of the time of the administration, and that the various office records were supposed to be gathered eventually into his custody. The bonds admitted at trial are accompanied by Eastern's Powers of Attorney and corporate authorizations which bear signatures identified by Gordon as the signatures of Eastern's corporate officers and employees. Gordon testified that the bonds were signed by Lori Hoffmeyer, an employee authorized to sign the bond by virtue of a power of attorney executed by Eastern's senior vice-president, whose signature was certified by Eastern's corporate secretary. Gordon testified that the bonds were written on Eastern's own bond form and were sealed with Eastern's corporate seal. Gordon did not testify, as LIGA suggests, that the bonds were not issued, only that he did not have a record of their issuance other than the regular bonds themselves. LIGA produced no evidence that the bond forms were stolen, or that any signature appearing on the bonds or the supporting documents was not genuine.
LIGA relies on Mistich v. United Ben. Life Ins. Co., 199 So.2d 14, 16 (La.App. 4 Cir.1967). There, the issue was whether delivery of a life insurance policy was effected by receipt of the policy by the agent, and the court held that the test of sufficient delivery is whether the company or its agent intentionally parts with control or dominion of the policy and places it in the control or dominion of the insured or someone acting for the insured with the purpose of thereby making a valid and binding contract of insurance. The controlling question is not actual possession, but the right of possession. We do not disagree with that principle of insurance law; however, in Mistich, the policy was returned to the agent subject to the fulfillment of certain requirements and conditions, including completion and verification of a medical questionnaire. The court was convinced that the company intended to transfer possession of the policy to the insured only upon fulfillment of the conditions. The instant record is devoid of any evidence tending to show that Eastern's delivery of the bonds to Mariner's, which occurred in the presence of the bankruptcy court, was in any way conditional. *1021 We find Mistich does not support LIGA's position, and that this assignment of error is without merit.

FOURTH ASSIGNMENT OF ERROR: The court erred in holding that LIGA's liability, if any, was not limited to $50,000.
The Insurance Guaranty Association Fund was created by Acts 1970, No. 81. As originally enacted, the law provided for a cap of $50,000 per unpaid claim. The Act was amended by Acts 1985, No. 780, section 1, to increase the cap to $150,000. Section 2 of No. 780 provided that the increase was applicable to insurers who became insolvent as defined in the statute after 1 September 1985. Act 172 of 1987 states as its purpose:
To amend and reenact R.S. 22:1379(3) and 1382(1)(A) relative to the Insurance Guaranty Association Law, to provide relative to insolvent insurers, to specify the definition of covered claim, to delete a limitation on the association's obligation for certain covered claims, and to provide for related matters....
Sec. 1379. Definitions
As used in this Part:
* * * * * *
(3) "Covered claim" means un unpaid claim ..., which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1, 1970, and (a) the claimant or insured is a resident of this state at the time of the insured event; or (b) the property from which the claim arises is permanently located in this state.... Section 2 provides: This Act is declared to be remedial and shall be applicable to covered claims which arise out of the insolvency of an insurer that is determined to be insolvent by a court of competent jurisdiction on or after January 1, 1987.
In 1989, the statute was again amended. In pertinent part, Acts 1989 No. 685 reenacted the $150,000 limit and provided for a maximum limit of $300,000 per accident or occurrence.
In 1990, Act 253 amended and reenacted 22:1382(1)(a) and (2)(b), reenacting the $150,000 per claim cap and the $300,000 per accident or occurrence cap, and defining accident and occurrence more specifically.
Acts 1992 No. 237 had as its stated purpose:
To amend and reenact R.S. 22:1386(A) and (C) and R.S. 22:1382(A)(2) and to enact R.S. 22:1386(D), relative to the Louisiana Insurance Guaranty Association; to remove the dollar-for-dollar offset used by said association against claimants of insolvent insurers; to provide for the duty to defend the insured of an insolvent insurance company; and to provide for related matters.
The amendment to section 1382 provided that when LIGA's liability has been exhausted by payment, its obligation to provide a defense to the insured shall cease.
We find nothing in the legislative history that would repeal the non-retroactivity provision of the 1985 legislation that increased the liability cap to $150,000. As a matter of law, the trial court erred in applying the 1985 statute retroactively, and the judgment is accordingly amended.
We do not agree with LIGA that Mariner's recovery should be limited to one payment of $50,000. Each bond was issued to cover a separate risk: one bond covered check # 608 for $300,000, and a second bond covered the separate risk for check # 609 for $300,000. In Guaranty Bank and Trust Co. v. Ideal Mut. Ins. Co., 526 So.2d 1094 (La. 1988), the Louisiana Supreme Court was presented a much closer case than Eastern's. In Guaranty, LIGA contended that 23 claims brought under a single indemnity bond for separate endorsements on separate loans made under a bank's loan outreach program were subject to a single statutory cap. The Supreme Court rejected LIGA's view with language helpful to the resolution of the instant case:
La.R.S. 22:1379(3) defines a covered claim as "an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy...." LIGA contends this is one insurance *1022 policy in the form of an indemnity bond, insuring the loss to the obligee bank under the LoanPower program.... The construction proposed by LIGA ignores the operation of the indemnity bond.... Each separate application for endorsement operates as a separate policy of insurance governed by the terms of the bond. Each loan insured was a separate and distinct risk.... Each defaulted loan was a separate loss giving rise to a distinct and separate claim. Each claim was individually submitted for payment. This construction has not led to absurd results or tremendous exposure.... The courts below correctly held that each endorsement was a separate covered claim and LIGA's limit of liability on each covered claim was $50,000, less the $100 deductible. 526 So.2d at 1100.
Here, LIGA's predecessor issued two separate bonds to cover exposures on two separate checks. There is nothing in the legislative history or the jurisprudence to suggest that the mere fact, standing alone, that the separate bonds were given to cover two separate checks tendered in connection with a complex real estate transaction involving only a single parcel would justify treating claims on the two bonds as a single claim. We find this assignment of error to be without merit.

FIFTH ASSIGNMENT OF ERROR: The court erred in awarding legal interest from 27 June 1984 instead of from date of judicial demand.
LIGA admits that if Eastern's failure to pay constituted an active breach of its bonds, legal interest would be owed from the date of breach. Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State University, 591 So.2d 690 (La.1991). LIGA contends that Eastern's failure to pay its obligations under the bonds was a passive breach under La.C.C. art. 1931, which defined passive breach of contract as occurring by the obligor's "not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract."
Eastern's failure to pay its obligation under the bond issued to FAMA is consistent with this definition of passive breach.[4]
La.C.C. art. 1911 provided that the passively breaching obligor may be put into default by various means, including a demand at the time stipulated for performance, which demand may be made by commencement of a suit, by a demand in writing, by a notarial protest or by verbal requisition made in the presence of two witnesses.
Mariner's produced the Cancellation Agreement of 9 July 1984 which sets forth in Article III that "claim has been made against the bonding company by Seller (Mariner's) for the payment of the $600,000.00, said bonding company having refused to honor the claims." Longenecker testified in a 1995 deposition that he went personally to Eastern's Fort Worth or Dallas office on 27 or 28 June 1984, and told Eastern's employee that the checks had been dishonored and the claim not paid. Longenecker testified in an earlier deposition that he followed this claim with a claim filed against Eastern in the Bankruptcy proceeding on or about 29 June 1984, which would constitute a further written demand pursuant to La.C.C. art. 1911. We do not find the trial court erred in concluding that Mariner's complied with the codal requirement, having put Eastern in default on or about 27 June 1984, and assessing interest from that date.
We note that La.R.S. 22:1382 provides for a deductible of $100 per claim which is not reflected in the trial court's judgment and amend the judgment to reflect those deductibles.

CONCLUSION AND DECREE
The judgment of the trial court holding the Louisiana Insurance Guaranty Association liable under two bonds issued by Eastern Indemnity Company of Maryland is amended to read as follows:
It is Ordered, Adjudged, and Decreed that there be judgment in this matter in favor of Mariner's Village Mandeville, Inc. *1023 and against Louisiana Insurance Guaranty Association in the full and true sum of One Hundred Thousand and no/100ths ($100,000.00) less a deductible of $200.00, together with interest thereon from 27 June 1984 until paid, together with all costs of these proceedings.
As amended, the judgment of the trial court is affirmed.
JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Also named defendants were Ese Flowers and W.O. Pruitt. Their personal liability was alleged pursuant to LSA-R.S. 14:71, based on their actual or constructive knowledge that at the time FAMA issued the checks, the corporation did not have the funds necessary to pay them.
[2] Made additional third party defendants were Cox, Crawford, Neiman Associates, Inc., Lee Cox, David E. Crawford, David P. Neiman, Revival Temple, Inc. d/b/a Four Corners of the Earth Foundation and Frank Montgomery. LIGA sought indemnity from the third party defendants.
[3] Although LIGA's first assignment of error refers to "any valid defenses such as want or failure of consideration," the only defense argued is failure of consideration.
[4] Similarly, an ex-husband's failure to pay alimony was held to be a passive breach of his alimony obligation in Dubin v. Dubin, 25,996 (La.App.2 Cir. 8/17/94), 641 So.2d 1036.