753 So.2d 369 (2000)
ALERION BANK, Formerly American Bank and Trust Company
v.
LOUISIANA INSURANCE GUARANTY ASSOCIATION.
No. 98 CA 2897.
Court of Appeal of Louisiana, First Circuit.
February 18, 2000.
Jack M. Alltmont, Raymond P. Ward, Sessions & Fishman, L.L.P., New Orleans, *370 for Plaintiff-Appellee Bank One, Louisiana, N.A. Formerly Alerion Bank.
Thomas E. Balhoff, Judith R. Atkinson, Roedel Parsons Koch Frost Balhoff & McCollister, Baton Rouge, for Defendant-Appellant The Louisiana Insurance Guaranty Association.
Before: SHORTESS, C.J., PARRO, and KUHN, JJ.
PARRO, J.
The Louisiana Insurance Guaranty Association (LIGA) appeals the trial court's summary judgment in favor of Bank One, Louisiana, National Association (Bank One), ordering LIGA to pay the full sum of $222,240.20, representing the principal amount due on two financial guaranty bonds, judicial interest on this amount from date of notice of default, July 19, 1989, until paid, and all court costs. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
This lawsuit was filed by Alerion Bank, formerly American Bank and Trust Company, claiming it was the owner and holder in due course of two promissory notes payable to American Bank and Trust Company one executed by Paul B. Pellegrine, Jr. (the Pellegrine note) and the other executed by Wilson L. Ardoin, Jr. (the Ardoin note). Each note was executed on June 17, 1988, and amended September 6, 1988. Each was for the amount of $125,000 and was secured against default by a financial guaranty bond in that amount from American Lloyd's dated June 17, 1988. Events of default under each note included the borrower's failure to pay principal and/or interest, insolvency of the borrower or guarantor, the appointment of a receiver or liquidator for the borrower or any guarantor, and the lender's deeming itself "to be insecure with regard to repayment" of the note.
American Lloyd's was declared insolvent and put into liquidation on June 21, 1989; all of its policies were cancelled as of that date, with coverage extended for an additional thirty days from that date under applicable law. The insolvency of the guarantor, American Lloyd's, constituted a default under the notes. The bank declared the notes in default and exercised its option to accelerate all payments due under the notes and to demand payment in full from its borrowers. According to Alerion's petition, the borrowers also defaulted on the notes on July 1, 1989, by failing to pay the monthly payments as provided. On July 19, 1989, the bank advised its borrowers, American Lloyd's, the state insurance commissioner, and LIGA that it was seeking payment in full under the financial guaranty bonds. On October 3, 1989, the bank filed proofs of claim with the liquidator of American Lloyd's. Eventually this suit was filed against LIGA for the unpaid principal and interest balances on both notes.
Bank One filed a motion for summary judgment on August 10, 1997, alleging it was the successor to American Bank and Trust Company and Alerion Bank and the holder in due course of the Pellegrine and Ardoin notes. Its motion was supported by an affidavit from Edgar F. Arbour, III, former secretary of Oxford Underwriters, Inc., the company that acted as agent and attorney-in-fact for American Lloyd's when the financial guaranty bonds were issued. Arbour attested that he executed the power of attorney forms accompanying the bonds, that the bonds were issued on forms used by American Lloyd's and were accompanied by duly executed power of attorney forms and corporate authorizations, that the practice of American Lloyd's was to enter bonds onto the bond register once they were properly issued, and that a letter approving the amendment to the Pellegrine and Ardoin notes was apparently signed by the chairman and CEO of American Lloyd's, John H. Kastner, who had authority to execute such a document. The Arbour affidavit was accompanied by copies of the financial guaranty *371 bonds, the power of attorney forms, letters approving the amendments to both notes, and the bond register used by American Lloyd's.
The bank's motion was also supported by the affidavit of Major L. Cazayoux, an Assistant Vice-President of Bank One. His affidavit outlined the sequence of bank mergers and name changes resulting in Bank One's status as owner and holder in due course of the Pellegrine and Ardoin notes and owner of the financial guaranty bonds. He identified the notes, the amendments to the notes, and the bonds, copies of which documents were attached to his affidavit. He stated that because of the receivership of American Lloyd's, Bank One had a claim against LIGA for the amounts guaranteed under the bonds. A copy of the notice of receivership and liquidation was attached, along with copies of the bank's proofs of claim and demand letters to the borrowers and American Lloyd's on both notes. Cazayoux stated that on July 1, 1989, Ardoin and Pellegrine defaulted under the notes by failing to pay the payments as provided, and that the notes also went into default as a result of the insolvency of American Lloyd's. He attested that because of these defaults, American Bank and Trust Company had exercised its right to accelerate all payments due under the notes. According to Cazayoux, as of April 14, 1997, the Pellegrine note had an outstanding principal balance of $111,220.10, plus interest in the amount of $101,886.61, with interest continuing to accrue at the rate of $35.04 per diem; the Ardoin note had a principal balance of $111,020.10, plus interest in the amount of $101,719.34, with interest continuing to accrue at the rate of $34.98 per diem.
LIGA opposed the motion and attached copies of a number of documents, most of which duplicated documents already in the record as attachments to the Bank One motion and supporting affidavits. Additional attachments included a letter providing American Lloyd's with notice of default on the Pellegrine note and a letter from "American Lloyd's in Liquidation" concerning the bond register. However, none of the LIGA attachments, including these letters, were attached to an affidavit, sworn to, or authenticated in any way.
After a hearing on the motion, the trial court granted the motion for summary judgment and entered judgment in favor of Bank One and against LIGA. This appeal followed.

APPLICABLE LAW
An appellate court reviews a trial court's decision to grant a motion for summary judgment de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Jarrell v. Carter, 632 So.2d 321, 323 (La.App. 1st Cir.1993), writ denied, 94-0700 (La.4/29/94), 637 So.2d 467. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. LSA-C.C.P. art. 966(A)(2); Rambo v. Walker, 96-2538 (La. App. 1st Cir.11/7/97), 704 So.2d 30, 32.
In this case, the burden of proof is on the moving party. See LSA-C.C.P. art. 966(C)(2). The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts that would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein. LSA-C.C.P. art. 967. A document which is not an affidavit or sworn to in any way, or which is not certified or attached to an affidavit, is not of sufficient *372 evidentiary quality on a motion for summary judgment to be given weight in determining whether there remain genuine issues of material fact. Robertson v. Northshore Regional Medical Ctr., 97-2068 (La.App. 1st Cir.9/25/98), 723 So.2d 460, 464.
LIGA was created in 1970 by the enactment of the Insurance Guaranty Association Law (the Act), Louisiana Revised Statutes 22:1375 through 1394, to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. LSA-R.S. 22:1375-76. The provisions of the Act are to be liberally construed to effect its purposes. LSA-R.S. 22:1378; see Senac v. Sandefer, 418 So.2d 543, 546 (La.1982). Under the Act, when an insurer is determined to be insolvent, LIGA is deemed to be the insurer to the extent of its obligation on pre-insolvency covered claims and has all the rights, duties, and obligations of the insolvent insurer as if that insurer had not become insolvent. LSA-R.S. 22:1382(A)(1)(a) and (A)(2). In addition, LIGA is obligated to the extent of covered claims arising after the determination of the insurer's insolvency, but arising prior to the expiration of thirty days after the date of such determination of insolvency. LSA-R.S. 22:1382(A)(1)(a)(i). A covered claim is any unpaid claim by or against the insured which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which the Act applies. LSA-R.S. 22:1379(3)(a).
Prior to its amendment in 1990, the Act applied to all kinds of direct insurance, except life, health and accident, title, disability, mortgage guaranty, and ocean marine insurance.[1] LSA-R.S. 22:1377(A)(before amendment). Because the claims in this case arose before the 1990 amendment, the financial guaranty bonds that are the subject of this litigation are within the types of insurance to which the Act applied. See, e.g., Guaranty Bank & Trust Co. v. Ideal Mutual Ins. Co., 526 So.2d 1094 (La.1988).

DISCUSSION
LIGA does not dispute that Bank One is the holder in due course of the Pellegrine and Ardoin notes and the owner of the financial guaranty bonds. LIGA's main contention is that the bank's claims are not "covered claims." LIGA's initial argument is that the claims are not covered because the bank manipulated the situation in order to force the borrowers to default on their payments within the thirty-day grace period after the bank learned American Lloyd's had been declared insolvent. A major portion of this argument is based on allegations in another lawsuit that was not made part of the record in the trial court and cannot be considered by this court on the appeal. LSA-C.C.P. art. 2164; Dawson v. Cintas Corp., 97-2275 (La.App. 1st Cir.6/29/98), 715 So.2d 165, 167. However, those arguments aside, there can be no doubt that the insolvency of a guarantor, American Lloyd's, constituted an event of default under the notes and the bank was within its rights to accelerate the notes and demand payment in full.[2] Also, according *373 to the Cazayoux affidavit, the borrowers also defaulted under the notes on July 1, 1989, by failing to pay the payments as provided therein.
LIGA's defense is also based on language in the bonds requiring the lender to notify the surety within thirty days of knowledge that the borrower has defaulted in any payment, after which the surety would have an additional thirty days to cure the default or pay the balance of the notes. Under this argument, if the insolvency of American Lloyd's was the triggering event of default, the bank's claim could not fall within the thirty-day grace period of the statute, because the bank had to wait thirty days from its knowledge of default "before it could legally make or pursue any claim" under the bonds against either American Lloyd's or LIGA. Similarly, because the borrowers did not default in making payments on the notes until after American Lloyd's was declared insolvent, if this failure to pay were to be considered the triggering event of default, the notice and opportunity-to-cure provisions of the bonds would again operate to place these claims beyond the thirty-day grace period under the statute.
We disagree with LIGA's interpretation of the bond and statutory language. As noted by the bank in its brief to this court, this interpretation of the bond's terms would allow many meritorious claims against insolvent insurers to "fall through the cracks," precluding recovery from LIGA. For various reasons, the standard language in many insurance policies allows the insurer a stated period of time to examine the claim, evaluate it, and determine whether it is covered before payment is due. If LIGA's policy interpretation were accepted, when that time period is beyond thirty days, the insured under such a policy would always face a potential gap in coverage, depending on when the loss occurs in relation to when the insurer is declared insolvent. One example is particularly illustrative. A fire insurer is declared insolvent and several days later, before the insured has obtained a replacement policy, the insured's home suffers fire damage. His policy with the insolvent insurer contains standard policy language to the effect that payment is not due until sixty days after the insured furnishes proof of loss. Even if the insured were to provide proof of loss by the thirtieth day of the statutory grace period, the insured could not claim payment from the insurer until sixty days later. If such a policy were interpreted as LIGA asserts in this case, the claim would not be covered because it could not be "legally made or pursued" until after the thirty-day grace period for LIGA coverage. This interpretation would undermine a major purpose of the Act, which is to prevent financial loss to policyholders resulting from the insolvency of their insurers.
We conclude that the time of the occurrence that caused the loss, rather than the time payment is due under the bonds, is the applicable date for application of the statutory provisions regarding LIGA's obligation. See Rogues v. Continental Cas. Co., 17 La.App. 465, 135 So. 51, 53 (La.App.Orl.1931); United States Fidelity & Guaranty Co. v. Fultz, 76 Ark. 410, 89 S.W. 93, 95 (1905); Union Cent. Life Ins. Co. v. Skipper, 115 F. 69, 72 (8th Cir.1902). The insolvency of American Lloyd's and the borrowers' failure to pay on demand both occurred within the thirty-day grace period provided by the statute. Furthermore, the bank made demand upon the borrowers, American Lloyd's, and LIGA within that period. Therefore, we conclude the trial court was legally correct in determining that LIGA is obligated to Bank One under the American Lloyd's financial guaranty bonds.
LIGA further contends that it demonstrated the existence of a genuine issue of material fact concerning whether these *374 bonds were properly issued. The American Lloyd's bond register has a notation for each bond issued, showing the bond number, the issuing agent, the principal obligor for whom the bond was issued, the term of the bond, a brief description of the amount and nature of the transaction, the name of the obligee on the underlying transaction, and remarks. For the two bonds at issue in this lawsuit, the register contains only the bond numbers and the notation, "Tentative." These two bonds are the only ones for which the remaining information is missing. Additionally, LIGA argues that because Arbour's affidavit stated that it was the practice and procedure of American Lloyd's to enter bonds onto the register once they were properly issued, the failure to complete the bond register entry for these two bonds indicates they were not properly issued.
We do not accept LIGA's contention that these circumstances call into question the issuance of the bonds. First, the actual bonds are in the possession of Bank One. Second, Arbour stated he executed the powers of attorney authorizing the issuance of the bonds, and that the bonds themselves were issued on American Lloyd's forms and were accompanied by the requisite corporate authorizations and power of attorney. It is these documents, not the bond register, that establish the authority under which the bonds were issued. Finally, under strikingly similar circumstances in the Mariner's Village case, our colleagues on the Fourth Circuit Court of Appeals determined that even though the issuer's books and records did not reveal issuance or receipt of premium payments for the bonds, the fact that the bonds were accompanied by powers of attorney and duly executed corporate authorizations was sufficient to establish that the bonds were properly issued. Mariner's Village Mandeville, Inc. v. Fama, Inc., 95-1867 (La.App. 4th Cir.3/14/96), 671 So.2d 1015, 1020, writ denied, 96-0944 (La.5/17/96), 673 So.2d 615. There, as in the case we are reviewing, the court noted that LIGA produced no evidence that the bond forms were stolen, that any signature appearing on the bonds or supporting documents was not genuine, or that delivery to the bank was conditional. Accordingly, we likewise conclude that Bank One has produced sufficient evidence to show that there is no genuine issue of material fact concerning the proper issuance of the bonds.
LIGA's final argument is that the trial court erred in awarding judicial interest against LIGA from date of notice of default, July 19, 1989, until paid. LIGA contends that if any interest is awarded, it should be from date of judicial demand, when suit was filed. Bank One argues that this question was addressed and answered in the Mariner's Village case. The court there determined that the insurer's failure to pay its obligation under the bond was a "passive breach" of contract, as that term was then defined in Article 1931 of the Louisiana Civil Code. Passive breach occurred by the obligor's "not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract."[3]Mariner's Village, 671 So.2d at 1022. Damages for passive breach of contract were due from the time the obligor was put in default, which could be accomplished in several ways, including making a verbal demand in the presence of two witnesses. The Mariner's Village court found that verbal demand had been made, and awarded judicial interest from date of that demand. Mariner's Village, 671 So.2d at 1022-23.
*375 Although the Civil Code has been extensively amended and the new provisions are applicable to this case, for the most part, the substance of the provisions relied upon in the Mariner's Village case has been retained in the revisions. Article 2000 states that when the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due at the rate agreed by the parties; legal interest is applied in the absence of agreement.[4] LSA-C.C. art. 2000. Article 1989 states that damages for delay in the performance of an obligation are owed from the time the obligor is put in default. Under Article 1991, an obligor can be put in default by a written request for performance, by an oral request before two witnesses, by filing a lawsuit, or by a specific provision in the contract. In the case we are reviewing, the evidence shows that written demand for payment was made on LIGA on July 19, 1989; the trial court awarded legal interest from that date.
We find no error in that ruling. It is consistent with the Mariner's Village decision and with the Fourth Circuit's decision in Johnsa v. Edwards, 569 So.2d 547 (La. App. 4th Cir.1990), affirmed in part, reversed in part, vacated in part, and remanded, 582 So.2d 1280 (La.1991).[5] In Johnsa, the Fourth Circuit affirmed an award of judicial interest from the date of judicial demand, despite the fact that the total award, with interest, exceeded the face amount of the bond. The rationale used was that the court's award of judicial interest did not arise out of the contract on the bond, but compensated the plaintiffs-in-reconvention for the cost of delay in collecting the funds.[6]
Like the Johnsa case, in the matter before this court each of the bonds established a "Maximum Liability" in the amount of $125,000. The bonds stated that in the event of default on the notes, the surety's liability under the bonds was payment of the full amount of the debt, principal plus accrued interest, but limited that amount with the following statement:
In no event shall Surety be liable under this Bond for any amounts other than principal and accrued interest, which principal and interest shall not exceed the Maximum Liability.
Applying the Civil Code provisions to the documents upon which Bank One's claim is based, we find that the parties had an agreement for contractual interest in the notes; that interest accrual was limited by the maximum liability provision in the bonds. However, the trial court did not award interest based on the contractual rate, but awarded legal interest from date *376 demand was made, in accordance with Article 1989. The parties had no agreement concerning the accrual of legal interest after demand had been made.[7] Therefore this award is also consistent with the provisions of Article 2000. We find the trial court was legally correct in awarding judicial (legal) interest from the date demand was made, July 19, 1989.

CONCLUSION
Based on the foregoing, the judgment of the trial court is affirmed. The costs of this appeal in the amount of $1,290.94 are assessed against LIGA.
AFFIRMED.
NOTES
[1] Louisiana Revised Statute 22:1377(A) was amended and reenacted by 1990 La. Acts, No. 101, § 1. The amendment specified additional types of insurance to which the Act would not apply, including "financial guaranty, or other insurances offering protection against investment risks, credit insurance, ... or any similar insurance which protects the interests of a creditor arising out of a creditor-debtor transaction...."
[2] The notes state that one of the events of default is the insolvency of "any guarantor." There was some suggestion at oral argument that, because American Lloyd's was a surety, it might be differentiated from a guarantor, such that its insolvency would not trigger the default provision of the notes. Our review of the Louisiana Civil Code, particularly the comments to Article 3037, convince us that this is a distinction without a difference. See LSA-C.C. art. 3037, Revision Comments 1987. This comment notes that the Article "recognizes that contracts of guaranty or suretyship may be confected in an infinite variety of forms, having little or no difference in their intended effect."
[3] The events giving rise to the Mariner's Village suit occurred during 1984. The Civil Code was amended by 1984 La. Acts, No. 331, § 1, effective January 1, 1985; the substance of Article 1931 is now reproduced in Article 1994, which states:

An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance.
[4] This provision was added by 1984 La. Acts, No. 331, § 1, effective January 1, 1985. The 1984 revision comments state that the Article is new and changes the law insofar as it establishes that, when a rate of interest has not been agreed upon, the measure of damages for delay in performing an obligation to pay a sum of money shall be the legal rate of interest in force at the time the sum of money is due. Otherwise, the Article reproduces the substance of former Articles 1935, 1937, and 1940. The only real change was in the method of computation of legal interest; former Article 1940 stated that in the absence of contractual interest, legal interest could be recovered based on the rate at the time the contract was made.
[5] The Johnsa case was brought to the attention of the court in a supplemental memorandum filed by Bank One in response to a question from the panel at oral argument. The court asked whether the maximum liability provisions in the bonds precluded the award of judicial interest exceeding that amount. Because the issue had not previously been raised or briefed by the parties, the court granted Bank One's motion to file a supplemental memorandum on this point.
[6] The Louisiana Supreme Court reversed and remanded the case on other grounds, noting that because on remand the trial court might determine that some amount not exceeding the face amount of the bond was due, the issue was premature. The court vacated that portion of the opinion, stating that "the question whether legal interest may be assessed when the resultant sum will exceed the penal amount of the bond may not be squarely presented, and the issue is, therefore, not ripe for our review." Johnsa, 582 So.2d at 1285.
[7] We note also that allowing a surety to contractually limit its liability for legal interest after demand would encourage delay in payment in every case, leaving the party to whom payment was owed with no way to enforce timely payment after demand and no adequate remedy for the surety's failure to perform its obligation.